A07A2485. IN THE INTEREST OF J. M., a child.
(657 SE2d 337)

BERNES, Judge.

The biological father of the minor female J. M. appeals the juvenile court's order denying his petition to legitimate the child and

---

terminating his parental rights.[1] Appellant contends that there was insufficient evidence to support the juvenile court's decision. For the reasons discussed below, we affirm.

> On appeal of an order denying a petition to legitimate and terminating parental rights, the evidence must be viewed in the light most favorable to the juvenile court's ruling to determine if any rational trier of fact could have found, by clear and convincing evidence, that the petition to legitimate should have been denied and that the parental rights should have been terminated. This Court does not weigh the evidence or determine the credibility of witnesses, and we must defer to the juvenile court's findings of fact if supported by the evidence.

(Citations and punctuation omitted.) *In the Interest of L. S. T.*, 286 Ga. App. 638 (649 SE2d 841) (2007).

Viewed in this light, the record shows that J. M. was born out of wedlock on April 15, 2002. At the time the mother became pregnant with J. M., appellant and the mother had been involved in an intimate relationship for a few months. When the mother was two or three months pregnant, appellant broke off his relationship with her after learning that she had an ongoing drug problem. After ending the relationship, appellant offered the mother no financial support or other assistance during the remainder of the pregnancy, and he was not present at the birth of J. M.

Initially, appellant denied that he was the father of J. M. and refused to provide the mother any financial support, although appellant conceded that he knew that the child "possibly" was his. When J. M. was three months old, the mother filed a petition for child support and to establish paternity. The paternity test proved that appellant was the biological father, and he was ordered to pay child support. As a result, appellant's wages were garnished. After paternity was established and his wages garnished, appellant asked the mother if he could have visitation with J. M., who was then one year old. The mother agreed, but the few visitations that did occur were sporadic and several weeks apart due to animosity and tension between the mother and appellant, who had gotten married following his breakup with the mother. After the fourth visit, the mother cut off the visitation altogether because J. M. came home with a bruise in the

---

[1] The juvenile court also terminated the parental rights of the mother. We previously dismissed the mother's appeal as untimely.

shape of a hand print on her buttocks. Appellant had no further contact with J. M. during the time the child lived with the mother.

In November 2003, J. M. came into the custody of the Cherokee County Department of Family and Children Services ("DFCS") after the mother voluntarily submitted to a drug screen and tested positive for methamphetamine and amphetamine. DFCS also had learned that the mother was living with a man who had been convicted of cruelty to children. Based on these circumstances, the juvenile court adjudicated J. M. deprived and awarded temporary custody to DFCS. The juvenile court's order noted that appellant had not attended the deprivation hearing and that his "whereabouts [were] unknown."

In January 2004, appellant for the first time filed a petition to legitimate J. M. in the Juvenile Court of Cherokee County.[2] A hearing on the petition, however, was continued on multiple occasions. This was due in part to appellant's repeated failure to appear at scheduled hearings.

Also in January, appellant contacted DFCS in order to seek visitation with J. M. DFCS developed a visitation schedule under which appellant was authorized to visit J. M. once every two weeks, with the visits supervised by Oasis Counseling, a private company hired to coordinate and supervise visitations. According to the DFCS case file admitted into evidence, appellant thereafter had approximately ten one-hour supervised visits with J. M.

In July 2004, however, appellant stopped his visitations with J. M. and then moved temporarily out of state to attend truck driving school. At the end of October 2004, after completing the driving school, appellant moved back to Georgia.

Approximately five months later, in March 2005, appellant contacted the DFCS caseworker about reestablishing visits with J. M. The caseworker provided appellant with the name and phone number of the counselor from Oasis Counseling who would handle the supervised visitations. The DFCS caseworker reiterated to appellant that he would need to call the Oasis counselor if he wanted to have visits with J. M. According to the Oasis counselor, however, appellant has never called her to reestablish visitation. As a result, appellant has not seen or visited J. M. since July 2004.

---

[2] As the dissent notes, appellant also requested that his home be considered as a placement for J. M. But, his home did not pass the evaluation because, among other reasons, he had a convicted child molester living in his home with his wife and children. In the ensuing months, DFCS twice attempted to schedule a follow-up home evaluation after appellant informed the agency that the convicted child molester no longer lived at the home and that he had fixed the other problems identified by the evaluation. Both attempts failed. The first time, DFCS was unable to reach appellant, and the second time, appellant informed DFCS that it was not a good time for the evaluation. After that conversation, DFCS never heard anything more from appellant about having a follow-up evaluation performed.

In May 2005, DFCS filed its petition to terminate appellant's parental rights. In November 2005, the juvenile court conducted a combined hearing on the termination petition and appellant's legitimation petition. Records from the DFCS case file for J. M. were admitted into evidence at the hearing. The juvenile court heard from multiple witnesses, including J. M.'s mother, appellant, the current DFCS caseworker, and the current Oasis counselor. The juvenile court also heard from the guardian ad litem, who recommended that the legitimation petition be denied because appellant had been "very passive" in attempting to develop a relationship with J. M. and "could have shown the initiative" to have contact and interaction with J. M. but "chose not to," resulting in there being "no emotional bond . . . between [appellant] and the child." Additionally, the guardian ad litem informed the juvenile court that J. M. had bonded with her foster parents who were willing to adopt her, and opined that it would be "traumatic and devastating" for J. M. to be removed from that foster home.

After hearing the testimony and reviewing the documentary evidence, the juvenile court entered an order denying appellant's legitimation petition and terminating his parental rights. In reaching this result, the juvenile court found that appellant's efforts to develop a relationship with J. M. had been "minimal" and that he had "abandoned his opportunity to establish a meaningful bond with the child." This appeal followed.

1. Appellant contends that there was insufficient evidence to support the juvenile court's denial of his petition to legitimate J. M. We disagree.

> In ruling on a legitimation petition presented by a biological father, the juvenile court must initially determine whether the father has abandoned his opportunity interest to develop a relationship with the child. If the juvenile court concludes that the father has abandoned his opportunity interest, that finding is sufficient to end the court's inquiry and justifies the denial of the legitimation petition.

(Citations and punctuation omitted.) *In the Interest of L. S. T.*, 286 Ga. App. at 639 (1). Absent an abuse of discretion, a juvenile court's determination that a biological father has abandoned his opportunity interest must be affirmed. See *Carden v. Warren*, 269 Ga. App. 275, 276 (1) (a) (603 SE2d 769) (2004). Applying these principles to the case at hand, we conclude that the trial court acted within its discretion in concluding that appellant abandoned his opportunity interest to develop a relationship with J. M. We reach this conclusion for three primary reasons.

(a) *Inaction during Pregnancy and at Birth.* First, as the juvenile court found in its order, "[i]n spite of his knowledge that the mother used drugs and had an addiction problem," appellant failed to take any steps "to insure the safety of the child" during the pregnancy or immediately following the birth. In this respect, appellant never contacted the police, DFCS, or any other social services agency to report the expecting mother's drug abuse problem in an effort to prevent harm to his unborn child. Likewise, appellant failed to offer any prenatal support or other assistance to the mother during her pregnancy or in the months immediately following the child's birth in an attempt to contribute to the child's health and safety.[3] Rather, after learning that the expecting mother was abusing drugs, appellant "just went out and got in [his] truck and left" and "there was no more relationship." Appellant never became proactive, instead telling himself that "there was nothing [he] could do." This evidence supported a finding that appellant had abandoned his opportunity interest in J. M. See *In the Interest of D. S. P.*, 233 Ga. App. 346, 348-349 (2) (504 SE2d 211) (1998) (abandonment shown by biological father's failure to provide support or assistance during pregnancy and immediately after the birth of the child). See also *Alexander v. Guthrie*, 216 Ga. App. 460, 461-462 (1) (454 SE2d 805) (1995).[4]

It is true that appellant testified that he initially was unsure whether J. M. was his child, but that does not excuse his inaction during the pregnancy or his failure to assume any responsibility for the care of the child after the birth. As an initial matter, the juvenile court was entitled to assign little weight to appellant's claim that he was unsure about being the father, given the fact that appellant testified that he had been involved in an intimate relationship with the mother for a few months leading up to the pregnancy, and given

---

[3] There is no evidence in the record that appellant ever took any active steps to provide financial support to J. M. at any point. Rather, appellant was forced to pay child support as a result of the mother's paternity action, and appellant's wages were garnished from his paycheck. According to appellant, he has always paid child support in the amount of $49 per paycheck, although he now has an annual income of $50,000 to $60,000. Appellant admitted that he should be paying at least $1,050 in monthly child support based on his current income, if he were to take steps to have his child support adjusted so that it is proportionate to his income – steps that he has never taken.

[4] Appellant's reliance on *Bowers v. Pearson*, 271 Ga. App. 266, 270-271 (609 SE2d 174) (2005) is misplaced. In that case, we held that a biological father's failure to assist or support the mother during the pregnancy did not support a finding of abandonment under the circumstances. See id. But, in *Bowers*, unlike here, the biological father never disputed his paternity and filed a legitimation petition before the child was born. See id. at 271. Furthermore, the record in that case reflected that the mother of the child refused to discuss the pregnancy at all with the father and thus prevented him from being involved during the pregnancy. See id. at 270. There is no evidence of similar conduct by the mother here. Furthermore, *Bowers* did not involve a situation where the mother was abusing drugs and thus potentially harming the unborn child.

the fact that there was no evidence in the record that the mother was unfaithful to appellant during their relationship, or that appellant believed she had been. See generally *Carden*, 269 Ga. App. at 276 (1) (a) (noting that the juvenile court "is the sole arbiter of the credibility of witnesses"). In any event, the fact that paternity has not yet been established definitively through genetic testing does not excuse a putative father's lack of involvement. Cf. *In the Interest of J. L. E.*, 281 Ga. App. 805, 806 (637 SE2d 446) (2006) (holding that "obtaining the results of genetic testing is not a condition precedent to filing a legitimation petition"). This is particularly true here, where appellant failed to take any affirmative steps of his own to have paternity established, and instead waited for the mother to file a child support action and seek paternity testing on her own initiative.

(b) *Delay in Filing a Legitimation Petition.* Second, appellant waited until J. M. was nearly two years old and in DFCS custody before seeking to legitimate her and obtain custody, and then contributed to delays that prevented the legitimation hearing from being held until J. M. was over three years old. This long delay in filing a legitimation petition further supported the trial court's conclusion that appellant abandoned his opportunity interest. See *In the Interest of L. S. T.*, 286 Ga. App. at 639 (1); *In the Interest of J. L. E.*, 281 Ga. App. at 806-807.

(c) *Lack of Contact.* Third and finally, the record reflects that although appellant has had intermittent contact with J. M. over the course of her life, he has failed to make a concerted, consistent effort to spend time with and interact with the child and thereby develop and nurture an emotional bond between them. Appellant did not establish visits with J. M. until she was one year old. Then, when the mother cut off visitation after only four visits, appellant took no immediate steps to ensure that he would continue to see the child, such as by legitimating the child and then seeking custody or visitation rights. See *Mitchell v. Ward*, 231 Ga. 671, 672 (203 SE2d 484) (1974) (noting that a "father of an illegitimate child, rendered legitimate by court order . . . , has a claim to parental and custodial rights with respect to his child"). Instead, he delayed taking any action until J. M. was removed from the mother's home by DFCS. Once J. M. was in DFCS custody, appellant initially made some effort to visit with the child, but cut off visitation in July 2004 and has not seen her since that time ultimately due to his own passivity. Given this lack of contact, appellant himself conceded at the legitimation hearing that it was probable that J. M. does not know who he is at this point. This evidence of lack of contact with the child likewise supported the trial court's conclusion that appellant had abandoned his opportunity

interest. See *In the Interest of J. L. E.*, 281 Ga. App. at 806-807; *Smith v. Soligon*, 254 Ga. App. 172, 173-174 (2) (561 SE2d 850) (2002).[5]

Appellant suggests that his failure to reestablish visits with J. M. after he returned to Georgia in October 2004 was the fault of DFCS and Oasis Counseling because his repeated phone calls went unanswered and his voice messages went unreturned. Appellant did present phone records indicating that he made some phone calls to DFCS and Oasis Counseling in November and December 2004. However, the current Oasis counselor, who handled the case throughout 2005, testified that she had never received a call from appellant at any point. In turn, the DFCS caseworker, who has handled J. M.'s case since January 2005, testified that she had no contact with appellant until they spoke on the phone in March 2005. During that March 2005 phone conversation, the DFCS caseworker reminded appellant that Oasis Counseling handled the scheduling of visits for DFCS; emphasized to appellant that he needed to contact the Oasis counselor if he wanted to visit J. M.; and provided appellant with the contact information for the counselor. The DFCS caseworker also contacted the Oasis counselor and informed her that appellant would be calling her in order to reestablish a visitation schedule. Nonetheless, the Oasis counselor testified that she never received a call from appellant. The juvenile court, as the trier of fact, was entitled to credit the testimony of the DFCS caseworker and Oasis counselor over that of appellant and conclude that, although appellant initially made some phone calls in an effort to reestablish visitation upon his return to Georgia, he thereafter abandoned any such effort by having only one contact with his DFCS caseworker from January 2005 until the legitimation hearing, and then disregarding the instructions provided to him by the caseworker about how to reestablish visitation through Oasis Counseling. As such, the juvenile court was authorized to find that the failure to reestablish visitation following appellant's return to Georgia in October 2004 was ultimately due to appellant's own lack of diligence and his noncompliance with the instructions of DFCS.

---

[5] Appellant relies on *In the Interest of T. E. T.*, 282 Ga. App. 269 (638 SE2d 412) (2006) to support his contention that he did not fail to develop and maintain a bond with J. M. But, in that case, the father properly legitimated the child, see id. at 271, and the only issue was whether the juvenile court erred in terminating his parental rights. See id. at 272-276. We held that the juvenile court erred under the facts presented at the termination hearing. See id. at 273-276. Those facts showed that the father of T. E. T. had visitation with the child up to two months prior to the final termination hearing and had regularly visited with the child prior to that time. See id. at 275. That is not the case here, where appellant sporadically visited J. M. over the first two years of her life and then failed to visit her at all after July 2004, more than a year prior to the legitimation hearing.

For these combined reasons, we conclude that the trial court did not abuse its discretion in finding that appellant abandoned his opportunity interest to develop a relationship with J. M. It is true, as the dissent contends, that there is some evidence in the record militating in favor of a finding that appellant did not abandon his opportunity interest. The question on appeal, however, is not whether there is some evidence in the record that supports appellant's position, when interpreted in the light most favorable to him. See *In the Interest of L. S. T.*, 286 Ga. App. at 638. Nor are we "authorized to substitute our judgment for that of the juvenile court." *In the Interest of S. V.*, 281 Ga. App. 331, 333 (2) (636 SE2d 80) (2006). The evidence, when properly construed in the light most favorable to the juvenile court's ruling, was sufficient to authorize the denial of appellant's petition to legitimate J. M.

2. Appellant also contends that the trial court erred in terminating his parental rights to J. M. "Given the father's failure to legitimate [J. M.], however, he lacks standing to challenge such termination." *In the Interest of L. S. T.*, 286 Ga. App. at 639 (1). See also *In the Interest of J. L. E.*, 281 Ga. App. at 807.

*Judgment affirmed. Barnes, C. J., Andrews, P. J., Blackburn, P. J., Smith, P. J., and Miller, J., concur. Ruffin, J., dissents.*

RUFFIN, Judge, dissenting.

Because the evidence in this case does not support the trial court's finding that appellant abandoned his opportunity interest in J. M., I dissent.

Our Supreme Court has stated that

> unwed fathers gain from their biological connection with a child an opportunity interest to develop a relationship with their children which is constitutionally protected. . . . It is, then, an interest which can be abandoned by the unwed father if not timely pursued. On the other hand it is an interest which an unwed father has a right to pursue through his commitment to becoming a father in a true relational sense as well as in a biological sense. Absent abandonment of his interest, a state may not deny a biological father a reasonable opportunity to establish a relationship with his child.[6]

Here, appellant questioned the paternity of the child during the mother's pregnancy based upon the timing of their relationship and

---

[6] *In re Baby Girl Eason*, 257 Ga. 292, 296 (1) (358 SE2d 459) (1987).

the mother's relationship with another man, and on the mother's statements to others that he was not the father. Nevertheless, he told the mother to let him know "if she needed something" during her pregnancy; but she did not ask him for any assistance, financial or otherwise.

Appellant visited J. M. when she was nine days old and, after paternity was established, he saw her multiple times for weekend visitation, whenever the mother would permit him to do so.[7] He provided the mother with items for the child, including diapers and toys, and he paid monthly child support from the time J. M. was six months old until his parental rights were terminated. After J. M. was taken into DFCS custody and appellant was advised that his failure to legitimate her "was going to be a problem," he immediately filed a pro se petition for legitimation and offered his home for placement.[8] He also sought and engaged in regular supervised visitation thereafter, until he left the state for ten weeks to attend a commercial driving school. When appellant returned, he contacted DFCS and the private company coordinating the supervised visits multiple times, but he contends that they were initially unable to agree upon dates for visitation and that Oasis did not return his calls thereafter.[9]

The majority concludes that appellant's "[i]naction during [p]regnancy and at [b]irth," his delay in seeking legitimation, and his "lack of contact" support the juvenile court's conclusion that he abandoned his opportunity interest in the child. I disagree. The record confirms appellant's long-term financial support of J. M. and his repeated efforts to visit her. Certainly, appellant could have done more to protect his parental rights when the mother refused to allow him visitation before paternity was established, and when his efforts to secure visitation through DFCS and Oasis were unsuccessful. However, I cannot conclude that his actions, including his immediate efforts after DFCS took custody of the child — particularly given his pro se status — constituted an abandonment of his opportunity interest in J. M.[10]

---

[7] According to the mother, J. M. spent four weekends with appellant; however, appellant testified that he had J. M. for eight or nine weekends and one entire week.

[8] Appellant's home was not approved because he had another baby in the home and his brother-in-law — who had been charged with molestation — lived with him. According to appellant, he made his brother-in-law move out thereafter, but for some reason DFCS failed to schedule another home visit.

[9] Appellant's telephone records from November and December 2004 confirm his calls to both DFCS and Oasis. And, contrary to the majority opinion, the DFCS caseworker did not deny that appellant tried to contact her before March 2005. Instead, she testified that she first spoke to him then and referred him to Oasis.

[10] See Bowers v. Pearson, 271 Ga. App. 266 (609 SE2d 174) (2005) (trial court erred in concluding that the father abandoned his opportunity interest during pregnancy where the

The majority relies on several cases in which we affirmed the trial court's finding that the father had abandoned his opportunity interest to develop a relationship with his child. But in those cases, the evidence supporting the abandonment was much more compelling. The father in *Alexander v. Guthrie*[11] had never seen or spoken to his approximately eight-year-old child, provided no financial support or prenatal assistance, and was incarcerated for child molestation offenses when the child was six. In *In the Interest of D. S. P.*,[12] the parents terminated their relationship soon after conception. During the pregnancy, "appellant refused to attend crisis counseling or otherwise provide emotional support to the mother. The mother was hospitalized and appellant provided no financial support as a result[,] even though appellant was financially able to provide such support."[13] Although the father knew that the mother intended to have the child adopted, he failed to take any action, including filing a legitimation petition, until two months after the child's birth.

In *In the Interest of J. L. E.*,[14] although DFCS advised the father about the legitimation process shortly after taking custody of his child, the father waited approximately 11 months thereafter to file his legitimation petition. He had some contact with J. L. E. before DFCS took custody, but he only visited the child two times thereafter. Most importantly, the father was serving a jail sentence at the time he filed the petition, and his incarceration was likely to continue until the child reached the age of majority. Finally, in *In the Interest of L. S. T.*,[15] the father initially refused to take a paternity test, was incarcerated, never visited the child and only spoke to her once after she was placed in foster care, waited two years to file a petition for legitimation — despite being advised to do so sooner — and failed to provide financial support.

Thus, these cases are readily distinguishable from the instant case, where appellant filed a legitimation petition immediately after J. M. was taken into DFCS custody, provided regular financial support, exercised visitation with the child when he was permitted to do so, and made repeated efforts to visit her when he was not.

Our obligation on appeal is to view the evidence in a light favorable to the ruling to determine "if any rational trier of fact could

---

father tried to discuss pregnancy with the mother and her family, but they refused and never sought assistance from the father, and the father filed legitimation petition and registered with the Georgia Putative Father's Registry before the child's birth).

[11] 216 Ga. App. 460, 461 (1) (454 SE2d 805) (1995).
[12] 233 Ga. App. 346, 347-348 (2) (504 SE2d 211) (1998).
[13] Id.
[14] 281 Ga. App. 805, 806-807 (637 SE2d 446) (2006).
[15] 286 Ga. App. 638, 639 (1) (649 SE2d 841) (2007).

have found, by clear and convincing evidence, that the petition to legitimate should have been denied and that the parental rights should have been terminated."[16]

This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. *Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.*[17]

My review of this case has been guided by the realization that "[t]here is no judicial determination which has more drastic significance than that of permanently severing a natural parent-child relationship. It must be scrutinized deliberately and exercised most cautiously."[18] Thus, I am compelled to dissent. In my opinion, the evidence does not support a finding that the appellant abandoned his opportunity interest in J. M., and thus, this ruling should be reversed and this case remanded to the juvenile court.[19]

DECIDED JANUARY 31, 2008.

*Richard A. Jones*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Elizabeth M. Williamson, Assistant Attorney General, Hope M. Pereira*, for appellee.

---

[16] See *In the Interest of L. S. T.*, supra at 638.

[17] (Punctuation omitted; emphasis supplied.) *In the Interest of D. S.*, 285 Ga. App. 752, 755 (647 SE2d 417) (2007).

[18] (Punctuation omitted.) *In the Interest of A. L. E.*, 248 Ga. App. 213 (546 SE2d 319) (2001).

[19] See *Doe v. Chambers*, 188 Ga. App. 879, 880 (1) (374 SE2d 758) (1988) (if the father has not abandoned his opportunity interest, the trial court must then determine his parental fitness for custody).